**Lansing, Michigan**

# Opinion

Chief Justice:

Robert P. Young, Jr.

Justices:

Michael F. Cavanagh
Marilyn Kelly
Stephen J. Markman
Diane M. Hathaway
Mary Beth Kelly
Brian K. Zahra

FILED JULY 30, 2012

STATE OF MICHIGAN

SUPREME COURT

PENNY JO JOHNSON,

Plaintiff-Appellee,

v

No. 143088

JOHN RECCA,

Defendant-Appellant.

BEFORE THE ENTIRE BENCH

MARKMAN, J.

We granted leave to appeal to consider whether, in a third-party tort action, damages for replacement services are recoverable pursuant to MCL 500.3135(3)(c).[1] Because "replacement services" is not among the categories listed in MCL 500.3135(3)(c), damages for replacement services are not recoverable in such an action.

---

[1] We note that on June 7, 2012, the Governor signed 2012 PA 158, which, effective October 1, 2012, amends MCL 500.3135 to increase the amount of motor vehicle damage not covered by insurance for which a person may sue the responsible party. The amendatory act does not affect our analysis here.

Accordingly, we reverse the Court of Appeals' judgment in part and reinstate the trial court's grant of summary disposition in defendant's favor on plaintiff's economic damages claim for replacement services expenses.

## I. FACTS AND HISTORY

In July 2004, while walking through a gas station parking lot, plaintiff was struck by a motor vehicle driven by defendant, who was insured by Allstate Property and Casualty Insurance Company. At the time, plaintiff lived with Harrietta Johnson, her ex-mother-in-law. Neither woman owned a vehicle, and neither was insured. Plaintiff filed a third-party tort claim against defendant, seeking damages for replacement services pursuant to MCL 500.3135(3)(c). The trial court granted summary disposition in defendant's favor, concluding that plaintiff could not recover damages for replacement services pursuant to MCL 500.3135(3)(c). The Court of Appeals reversed, concluding that plaintiff could recover damages for replacement services under MCL 500.3135(3)(c). *Johnson v Recca*, 292 Mich App 238, 249; 807 NW2d 363 (2011). Defendant appealed, and we granted leave, limited to the issue whether MCL 500.3135(3)(c) includes within its scope the cost of replacement services rendered more than three years after the date of the motor vehicle accident. *Johnson v Recca*, 490 Mich 926 (2011).[2]

## II. STANDARD OF REVIEW

We review de novo motions for summary disposition brought under MCR 2.116(C)(10). *Dressel v Ameribank*, 468 Mich 557, 561; 664 NW2d 151 (2003). We

---

[2] With respect to defendant's remaining issue, leave to appeal is denied, because we are not persuaded that the question presented should be reviewed by this Court.

2

also review de novo issues of statutory interpretation. *Eggleston v Bio-Med Applications of Detroit, Inc*, 468 Mich 29, 32; 658 NW2d 139 (2003).

## III. ANALYSIS

At issue is whether, in a third-party tort action, damages for replacement services are recoverable pursuant to MCL 500.3135(3)(c). Under the no-fault automobile insurance act, MCL 500.3101 *et seq*., insurance companies are required to provide first-party insurance benefits, referred to as personal protection insurance (PIP) benefits for certain expenses and losses. MCL 500.3107; MCL 500.3108. PIP benefits are payable for four general categories of expenses and losses: survivor's loss, allowable expenses, work loss, and replacement services. "Survivor's loss" is defined in MCL 500.3108(1), and "allowable expenses," "work loss," and replacement services are defined as follows in MCL 500.3107(1):[3]

> (a) *Allowable expenses* consisting of all reasonable charges incurred for reasonably necessary products, services and accommodations for an injured person's care, recovery, or rehabilitation. Allowable expenses within personal protection insurance coverage shall not include charges for a hospital room in excess of a reasonable and customary charge for semiprivate accommodations except if the injured person requires special or intensive care, or for funeral and burial expenses in the amount set forth in the policy which shall not be less than $1,750.00 or more than $5,000.00.

> (b) *Work loss* consisting of loss of income from work an injured person would have performed during the first 3 years after the date of the

---

[3] The term "replacement services" originates from the Uniform Motor Vehicle Accident Reparations Act (UMVARA), which provides:

> "Replacement services loss" means expenses reasonably incurred in obtaining ordinary and necessary services in lieu of those the injured person would have performed, not for income but for the benefit of himself or his family, if he had not been injured. [UMVARA, § 1(a)(5)(iii); 14 ULA 44.]

3

accident if he or she had not been injured. Work loss does not include any loss after the date on which the injured person dies. Because the benefits received from personal protection insurance for loss of income are not taxable income, the benefits payable for such loss of income shall be reduced 15% unless the claimant presents to the insurer in support of his or her claim reasonable proof of a lower value of the income tax advantage in his or her case, in which case the lower value shall apply. Beginning March 30, 1973, the benefits payable for work loss sustained in a single 30-day period and the income earned by an injured person for work during the same period together shall not exceed $1,000.00, which maximum shall apply pro rata to any lesser period of work loss. Beginning October 1, 1974, the maximum shall be adjusted annually to reflect changes in the cost of living under rules prescribed by the commissioner [of the Office of Financial and Insurance Regulation] but any change in the maximum shall apply only to benefits arising out of accidents occurring subsequent to the date of change in the maximum.

(c) [*Replacement services*] Expenses not exceeding $20.00 per day, reasonably incurred in obtaining ordinary and necessary services in lieu of those that, if he or she had not been injured, an injured person would have performed during the first 3 years after the date of the accident, not for income but for the benefit of himself or herself or of his or her dependent. [Emphasis added.]

Although the no-fault act generally abolishes tort liability arising from the ownership, maintenance, or use of a motor vehicle, MCL 500.3135 provides several exceptions to the general rule. One such exception is set forth in MCL 500.3135(3), which provides in relevant part:

Notwithstanding any other provision of law, tort liability arising from the ownership, maintenance, or use within this state of a motor vehicle with respect to which the security required by [MCL 500.3101] was in effect is abolished except as to:

\* \* \*

(c) Damages for *allowable expenses, work loss, and survivor's loss* as defined in [MCL 500.3107 to MCL 500.3110] in excess of the daily, monthly, and 3-year limitations contained in those sections. The party liable for damages is entitled to an exemption reducing his or her liability

4

by the amount of taxes that would have been payable on account of income the injured person would have received if he or she had not been injured. [Emphasis added.]

"An overarching rule of statutory construction is that this Court must enforce clear and unambiguous statutory provisions as written." *United States Fidelity & Guaranty Co v Mich Catastrophic Claims Ass'n (On Rehearing)*, 484 Mich 1, 12; 795 NW2d 101 (2009) (*USF&G*) (quotation marks and citation omitted). MCL 500.3135(3)(c) is a clear and unambiguous provision, providing that "[d]amages for allowable expenses, work loss, and survivor's loss" are recoverable in a third-party tort action. MCL 500.3135(3)(c) does not mention damages for replacement services. Therefore, in a third-party tort action, damages for replacement services are not recoverable pursuant to MCL 500.3135(3)(c),[4] and the Court of Appeals erred by holding otherwise.

## IV. THE COURT OF APPEALS ERRED

Contrary to our present holding, the Court of Appeals held that damages for replacement services are recoverable in a third-party tort action. *Johnson*, 292 Mich App at 249. Apparently in agreement with our conclusion that only damages for those categories of PIP benefits actually mentioned in MCL 500.3135(3)(c) are recoverable, it grounded its holding in the observation that "replacement services" constitutes "merely one category of allowable expenses." *Id.* at 247. For the reasons explained in this

---

[4] This conclusion is supported by the traditional legal maxim *expressio unius est exclusio alterius*, "the expression of one thing suggests the exclusion of all others," *Pittsfield Charter Twp v Washtenaw Co*, 468 Mich 702, 712; 664 NW2d 193 (2003), which is reinforced here because MCL 500.3135(3) provides that tort liability is abolished "except*"* with regard to those damages listed in MCL 500.3135(3).

5

opinion, we disagree. Instead, we believe that "replacement services" and "allowable expenses" constitute separate and distinct categories of PIP benefits under the statute.

## A. STATUTORY ORGANIZATION

The first and most obvious criticism of the Court of Appeals' conclusion that replacement services constitutes a subcategory of allowable expenses is that this simply overlooks the Legislature's own statutory organization, which makes clear that allowable expenses and replacement services constitute separate and distinct categories of PIP benefits. "Allowable expenses" are described in MCL 500.3107(1)(a), "replacement services" are described in MCL 500.3107(1)(c), and "work loss" expenses are described in-between in MCL 500.3107(1)(b). "Replacement services" are not described or referred to in the same subdivision as "allowable expenses," nor are "replacement services" described in any subpart of "allowable expenses." This organization of MCL 500.3107 clearly indicates that "replacement services" constitutes a category of PIP benefits that is separate and distinct from "allowable expenses."

"We interpret th[e] words in [the statute in] light of their ordinary meaning and their context within the statute and read them harmoniously to give effect to the statute as a whole." *People v Peltola*, 489 Mich 174, 181; 803 NW2d 140 (2011). Statutory interpretation requires courts to consider the *placement* of the critical language in the statutory scheme. *USF&G*, 484 Mich at 13. In doing so, courts "must give effect to every word, phrase, and clause in a statute and avoid an interpretation that would render any part of the statute surplusage or nugatory." *State Farm Fire & Cas Co v Old Republic Ins Co*, 466 Mich 142, 146; 644 NW2d 715 (2002). The Court of Appeals' interpretation improperly rendered the Legislature's organization nugatory by giving no

6

effective meaning to the Legislature's compartmentalization of "allowable expenses" and "replacement services."[5]

B. *GRIFFITH v STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY*

The Court of Appeals also misread our decision in *Griffith v State Farm Mut Auto Ins Co*, 472 Mich 521; 697 NW2d 895 (2005). In *Griffith*, the plaintiff was severely injured in a motor vehicle accident. After the plaintiff returned home from a nursing facility, the defendant insurance company denied the plaintiff's claim for food costs,[6] and the plaintiff brought suit, alleging that food costs constituted allowable expenses. This Court rejected that argument, explaining that in MCL 500.3107(1)(a), "recovery" and "rehabilitation" refer to restoring an injured person back to the condition he or she was in before sustaining the injuries, while the term "care" has a broader and more encompassing meaning. *Id.* at 534-535. That is, "care" "may encompass expenses for products, services, and accommodations that are necessary because of the accident but that may not restore a person to his preinjury state." *Id*. at 535. However, we clarified that

---

[5] The Court of Appeals attempted to explain why the Legislature separately addressed "allowable expenses" and "replacement services" by asserting that the statutory separation of these categories of expenses enabled the Legislature to place limits on the amount of replacement services that must be paid by a no-fault insurer. *Johnson*, 292 Mich App at 247. However, nothing would have prevented the Legislature from establishing those limits even if replacement services had been included in the same subdivision as allowable expenses. Indeed, the Legislature was able to accomplish that result where replacement services were formerly placed in the same subdivision as work loss. See part IV(C) of this opinion.

[6] Relevant to both *Griffith* and this case, the food costs at issue in *Griffith* were for "ordinary, everyday food expenses" and not for special dietary or nutritional expenses that were necessitated by the injury. *Griffith*, 472 Mich at 531-532.

7

the statute does not require compensation for any item that is reasonably necessary to a person's care in general. Instead, the statute specifically limits compensation to charges for products or services that are reasonably necessary "for an *injured person's* care, recovery, or rehabilitation." (Emphasis added.) This context suggests that "care" must be related to the insured's injuries. [*Id.* at 534.]

We further clarified:

> [I]f Griffith had never sustained, or were to fully recover from, his injuries, his dietary needs would be no different than they are now. We conclude, therefore, that his food costs are completely unrelated to his "care, recovery, or rehabilitation" and are not "allowable expenses" under MCL 500.3107(1)(a). [*Id.* at 536.]

Citing *Griffith*, the Court of Appeals reasoned:

> Considered within the definition of "care" in § 3107(1)(a) provided by the Supreme Court in *Griffith*, replacement services are services for the "care" of an injured person. Replacement services are those services performed by another that the injured person would have performed for his or her benefit or the benefit of dependents had the person not been injured. MCL 500.3107(1)(c). Consequently, replacement services are services that are needed as the result of an injury sustained in the motor vehicle accident. See *Griffith*, 472 Mich at 535. . . . Because replacement services are services for the "care" of an injured person, we conclude that replacement-services expenses are not separate and distinct from allowable expenses; rather, they are merely one category of allowable expenses. [*Johnson*, 292 Mich App at 246-247.]

The Court of Appeals' wholesale inclusion of "replacement services" as a subcategory of "allowable expenses" rests on its overly expansive reading of *Griffith*. Although it can be fairly said that "replacement services are services that are needed as the result of an injury," *id*., at 246, it does not follow that they fall within the definition of "care" set forth in *Griffith*. Accordingly, it does not follow that replacement services constitutes merely a subcategory of allowable expenses.

8

As we noted in *Griffith,* "the statute does not require compensation for any item that is reasonably necessary to a person's care *in general*." *Griffith*, 472 Mich at 534 (emphasis added). Rather, such care "must be related to the insured's injuries." *Id.* In *Griffith*, the plaintiff's food costs were not allowable expenses because "if Griffith had never sustained, or were to fully recover from, his injuries, his dietary needs would be no different than they are now." *Id.* at 536. Accordingly, allowable expenses do not include expenses for products or services that are required after the injury in a manner indistinguishable from those required before the injury. Those services are not properly characterized as "related to the insured's injuries."

Services that were required both before and after the injury, but after the injury can no longer be provided by the injured person himself or herself *because* of the injury, are "replacement services," not "allowable expenses." They are services "in lieu of those that, if he or she had not been injured, an injured person would have performed . . . for the benefit of himself or herself . . . ." MCL 500.3107(1)(c). Thus, contrary to the Court of Appeals' interpretation of *Griffith*'s definition of "care," replacement services is not "merely one category of allowable expenses"; rather, allowable expenses and replacement services are separate and distinct categories of PIP benefits.

In support of its interpretation, the Court of Appeals provided the following example:

> [P]laintiff claims that before the accident she prepared her own meals, but since the accident and because of the back injury she sustained in the accident, she is no longer able to cook and [her ex-mother-in-law] does so for her. If a person injured in a motor vehicle accident cooked his or her food before being injured, but because of the injury sustained is no longer able to cook, any expense incurred in paying someone to cook for

9

him or her is a replacement-service expense. But the expense is *also* conceptually an "allowable expense" because the cooking service is "care" as defined in *Griffith*; it was necessitated by the injury sustained in the accident. [*Johnson*, 292 Mich App at 246-247 (emphasis added).]

The Court of Appeals was correct that because someone else must now, because of the injury, cook plaintiff's meals, cooking constitutes a replacement service. That is, it is an "ordinary and necessary service[] in lieu of [one] that, if he or she had not been injured, [plaintiff] would have performed" for her own benefit. MCL 500.3107(1)(c). However, the Court of Appeals was incorrect that "the expense is *also* . . . an 'allowable expense' because the cooking service is 'care' as defined in *Griffith*[.]" *Johnson*, 292 Mich App at 247. The cooking service is not "care" as defined in *Griffith*.

As with the food in *Griffith*, there is no doubt that cooking is necessary for plaintiff's survival. However, cooking is not "care" pursuant to MCL 500.3107(1)(a) because if plaintiff "had never sustained, or were to fully recover from, [her] injuries," her need to have food cooked "would be no different" than it is now. *Griffith*, 472 Mich at 536. Cooking was required both before and after plaintiff's injury. Thus, cooking is necessary to plaintiff's care *in general*, but is not *specifically* "related to the insured's injuries" which places it outside the scope of "allowable expenses." *Id.* at 534. Rather, cooking in this instance is solely a "replacement service," something that must now be done on *behalf* of an injured person.[7]

---

[7] On the other hand, if a person sustains injuries that necessitate that someone actually feed the person, this service would constitute "care" pursuant to MCL 500.3107(1)(a). The need to have someone feed the injured person would not have existed absent the injuries, and this service would then be specifically related to the person's injuries.

10

For these reasons, our definition of "care" in *Griffith* does not support, but refutes, the Court of Appeals' conclusion that "replacement services" constitutes a subcategory of "allowable expenses."

## C. OTHER NO-FAULT PROVISIONS

The other provisions of the no-fault act cited by the Court of Appeals in support of its interpretation of MCL 500.3107(1) do not provide any basis, in our judgment, for concluding that replacement services constitutes a subcategory of allowable expenses. These statutes, MCL 500.3110(4),[8] MCL 500.3116(4),[9] MCL 500.3135(3)(c), and MCL 500.3145(1),[10] contain general rules regarding the recovery of economic losses. Thus,

---

[8] MCL 500.3110(4) provides:

> Personal protection insurance benefits payable for accidental bodily injury accrue not when the injury occurs but as the *allowable expense, work loss or survivors' loss* is incurred. [Emphasis added.]

[9] MCL 500.3116(4) provides:

> A subtraction or reimbursement shall not be due the claimant's insurer from that portion of any recovery to the extent that recovery is realized for noneconomic loss as provided in [MCL 500.3135(1)] and (2)(b) or for *allowable expenses, work loss, and survivor's loss* as defined in [MCL 500.3107 to MCL 500.3110] in excess of the amount recovered by the claimant from his or her insurer. [Emphasis added.]

[10] MCL 500.3145(1) provides:

> An action for recovery of personal protection insurance benefits payable under this chapter for accidental bodily injury may not be commenced later than 1 year after the date of the accident causing the injury unless written notice of injury as provided herein has been given to the insurer within 1 year after the accident or unless the insurer has previously made a payment of personal protection insurance benefits for the injury. If the notice has been given or a payment has been made, the action may be commenced at any time within 1 year after the most recent

11

argued the Court of Appeals, replacement services, as economic losses, should be included whenever the phrase "allowable expenses, work loss, and/or survivor's loss" is used in the no-fault act.[11]   If replacement services are included among "allowable expenses, work loss, and survivor's loss," *all* economic losses are covered by the foregoing provisions.  If not, replacement services would be the only economic losses excluded.   That is, replacement services, and only replacement services, would be excluded from the accrual provision, MCL 500.3110(4); the subtraction-or-reimbursement provision, MCL 500.3116(4); the residual-tort-liability provision, MCL 500.3135(3)(c); and the exception to the one-year period of limitations in MCL 500.3145(1).   This, the Court of Appeals argued, supports the conclusion that replacement services constitutes a category of allowable expenses.  *Johnson*, 292 Mich App at 248.  Although this argument has superficial appeal, it suffers from two flaws.

> *allowable expense, work loss or survivor's loss* has been incurred. However, the claimant may not recover benefits for any portion of the loss incurred more than 1 year before the date on which the action was commenced.  The notice of injury required by this subsection may be given to the insurer or any of its authorized agents by a person claiming to be entitled to benefits therefor, or by someone in his behalf.  The notice shall give the name and address of the claimant and indicate in ordinary language the name of the person injured and the time, place and nature of his injury. [Emphasis added.]

[11] The Court of Appeals frames this determination in the negative, explaining: "We find nothing in the language of the no-fault act to suggest an intent by the Legislature to exclude replacement services expenses from general rules applying to the recovery of economic losses."  *Johnson*, 292 Mich App at 248.  Yet, as defendant submits, the more pertinent question is whether the no-fault act *includes* replacement services within MCL 500.3135(3)(c) as damages spared from the general abolition of tort liability, not whether there is any reason to exclude them.  MCL 500.3135(3)(c) is explicitly *exclusive*; unless there is a reason to *include* replacement services, they must be excluded.

12

First, even if it is true that the foregoing provisions imply that replacement services should be included among the listed economic losses, nothing in them suggests that replacement services is a subcategory of *allowable expenses*, as opposed to work loss or survivor's loss. Before 1992, MCL 500.3107 referred to only two types of benefits-- "allowable expenses" and "work loss." MCL 500.3107, as amended by 1988 PA 312, provided:

> Personal protection insurance benefits are payable for the following:
>
> (a) *Allowable expenses* consisting of all reasonable charges incurred for reasonably necessary products, services and accommodations for an injured person's care, recovery, or rehabilitation. Allowable expenses within personal protection insurance coverage shall not include charges for a hospital room in excess of a reasonable and customary charge for semiprivate accommodations except when the injured person requires special or intensive care, or before October 1, 1988 charges for funeral and burial expenses in excess of $1,000.00. Beginning October 1, 1988, benefits for funeral and burial expenses shall be payable in the amount set forth in the policy but shall not be less than $1,750.00 nor more than $5,000.
>
> (b) *Work loss* consisting of loss of income from work an injured person would have performed during the first 3 years after the date of the accident if he or she had not been injured and [*replacement services*] *expenses not exceeding $20.00 per day, reasonably incurred in obtaining ordinary and necessary services in lieu of those that, if he or she had not been injured, an injured person would have performed during the first 3 years after the date of the accident, not for income but for the benefit of himself or herself or of his or her dependent.* Work loss does not include any loss after the date on which the injured person dies. Because the benefits received from personal protection insurance for loss of income are not taxable income, the benefits payable for such loss of income shall be reduced 15% unless the claimant presents to the insurer in support of his or her claim reasonable proof of a lower value of the income tax advantage in his or her case, in which case the lower value shall apply. Beginning March 30, 1973, the benefits payable for work loss sustained in a single 30-day period and the income earned by an injured person for work during the same period together shall not exceed $1,000.00, which maximum shall

13

apply pro rata to any lesser period of work loss. Beginning October 1, 1974, the maximum shall be adjusted annually to reflect changes in the cost of living under rules prescribed by the commissioner [of insurance] but any change in the maximum shall apply only to benefits arising out of accidents occurring subsequent to the date of the change in the maximum. [Emphasis added.][12]

The provision governing allowable expenses under the 1988 version of MCL 500.3107 was, for the instant purposes, identical to the corresponding provision in the current version of MCL 500.3107.[13] This, however, is not the case for the provision governing work loss. Before 1992, work loss benefits included, in addition to loss of income from work, replacement services, i.e.,

expenses not exceeding $20.00 per day, reasonably incurred in obtaining ordinary and necessary services in lieu of those that, if he or she had not been injured, an injured person would have performed during the first 3 years after the date of the accident, not for income but for the benefit of himself or herself or of his or her dependent. [MCL 500.3107(b), as amended by 1988 PA 312.]

Effective in 1992, the Legislature moved that portion of the work loss provision describing replacement services into its own subdivision, MCL 500.3107(1)(c), and otherwise left the remainder of the work loss provision, now MCL 500.3107(1)(b), unchanged. MCL 500.3107, as amended by 1991 PA 191, effective January 1, 1992. This suggests that the Legislature *never* considered replacement services to constitute a

---

[12] MCL 500.3107 was first enacted in 1972 and became effective on March 30, 1973. 1972 PA 294. 1988 PA 312 made only minor changes to the statute, including the funeral and burial expense-limit adjustment set forth at the end of MCL 500.3107(a) and the addition of a serial comma to the phrase "care, recovery, or rehabilitation."

[13] The current version of the statute was enacted by 1991 PA 191, effective January 1, 1992. The 1991 amendment did not substantively alter the allowable expenses provision but merely revised the language concerning funeral and burial expenses.

14

subcategory of allowable expenses. Rather, when replacement services were formerly included within another category of benefits, those benefits were work loss benefits, not allowable expenses benefits.[14] Given that replacement services was a category of work loss benefits before 1992, and, thus, clearly not a category of allowable expenses benefits, the fact that "allowable expenses" is defined in the same way that it was in 1972 and 1988 belies the conclusion that replacement services somehow became a category of allowable expenses in 1992. In sum, just as the use of the term "allowable expenses" did not import replacement services into MCL 500.3110(4), MCL 500.3116(4), 500.3135(3)(c), and MCL 500.3145(1) before the effective date of 1991 PA 191, it does not import them now.

Second, this argument is directed at the wrong branch of government. This Court only has the constitutional authority to exercise the "judicial power." Const 1963, art 6, § 1. "[O]ur judicial role 'precludes imposing different policy choices than those selected by the Legislature . . . .'" *Robertson v DaimlerChrysler Corp*, 465 Mich 732, 759; 641

---

[14] The Court of Appeals asserted that because the "expenses" in MCL 500.3107(1)(c) are not labeled "replacement services expenses," "it is reasonable to conclude that the expenses are simply one category of allowable expenses . . . ." *Johnson*, 292 Mich App at 247-248. This assertion is unavailing for several reasons. First, "allowable expenses" is a concept that is specifically defined in MCL 500.3107(1)(a). It simply will not do to say that because MCL 500.3107(1)(c) refers to "expenses" that are *allowable* under that subsection, that such expenses can then be considered "allowable expenses" despite the specific definition of "allowable expenses" in a separate subdivision. Second, as the foregoing analysis makes clear, replacement services benefits constituted a subcategory of work loss benefits before 1992, and the same argument-- that because the description of allowable expenses for replacement services used the term "expenses," expenses for replacement services must be "allowable expenses"-- would have applied then. Thus, if the term "expenses" in the description of replacement services did not render them "allowable expenses" before 1992, nothing suggests it should do so now.

15

NW2d 567 (2002), quoting *People v Sobczak-Obetts*, 463 Mich 687, 694-695; 625 NW2d 764 (2001). "Whether or not a statute is productive of injustice, inconvenience, is unnecessary, or otherwise, are questions with which courts . . . have no concern." *Voorhies v Recorder's Court Judge*, 220 Mich 155, 157; 189 NW 1006 (1922) (quotation marks and citation omitted). "It is to be assumed that the legislature . . . had full knowledge of the provisions . . . and we have no right to enter the legislative field and, upon assumption of unintentional omission . . . , supply what we may think might well have been incorporated." *Reichert v Peoples State Bank*, 265 Mich 668, 672; 252 NW 484 (1934). Thus, despite the acknowledged possibility that the Legislature's failure to amend MCL 500.3135(3)(c) and the other provisions that employ the phrase "allowable expenses, work loss, and/or survivor's loss" to include replacement services may have been the result of an oversight, that is not self-evident to us, and the judiciary is powerless to address the problem. Simply stated, the judicial branch cannot amend the no-fault act to make it "better." That is an authority reserved solely to the Legislature.

## V. RESPONSE TO THE DISSENT

This case is focused on a tension that exists within the no-fault act. On one side, the language of MCL 500.3135(3)(c) and the organization of MCL 500.3107 indicate that replacement services are not recoverable in a third-party tort action. See parts III and IV(A) of this opinion. On the other side, it is not easy to comprehend why the Legislature would elect to exclude only replacement services from the no-fault provisions that provide the general rules regarding the recovery of economic losses. See part IV(C) of this opinion. Thus, in arriving at a decision, this Court is confronted with the task of

16

resolving this tension, and the majority attempts to do so through the analysis previously set forth.

The dissent, however, elects to ignore this tension and therefore concludes that this is a simple case. It finds little need to engage in statutory analysis, or to assess the implications of the statute's organization, but focuses on the exclusion of replacement services from the other no-fault provisions concerning economic losses. Thus, it has minimized exactly those aspects of this case that make it so difficult. By minimizing the obvious tension that defines the relevant provisions of the no-fault act, the dissent transforms a difficult interpretive task into an easy one.

To the extent that the dissent can be said to have actually considered the language and organization of the statute, it does so in the most cursory fashion, largely relying on a house legislative analysis, a staff-prepared summary of the law that this Court has previously described as "entitled to little judicial consideration" in the construction of statutes. *In re Certified Question from the United States Court of Appeals for the Sixth Circuit*, 468 Mich 109, 115 n 5; 659 NW2d 597, 600 (2003). Further, even if in this instance the house legislative analysis did constitute a reliable indicator of the Legislature's intent, the specific analysis invoked by the dissent nonetheless fails to support its conclusion that replacement services are recoverable in a third-party tort action. Rather, the dissent strains to make its point from this analysis by relying solely on its silence regarding other intended changes. See *post* at 5.

Where the dissent actually engages with the statutory language itself is almost exclusively in its assertion that the majority's interpretation renders "allowable expenses" nugatory in MCL 500.3135(3)(c). The dissent argues that since there are no "daily,

17

monthly or 3-year limitations" on allowable expenses pursuant to MCL 500.3107(1)(a), the reference in MCL 500.3135(3)(c) to "allowable expenses" is nugatory unless "allowable expenses" includes replacement services. Although we recognize that the dissent is correct that there are no limitations on allowable expenses, the dissent's argument is unpersuasive. The acknowledgedly nugatory reference to "allowable expenses" in MCL 500.3135(3)(c) existed before MCL 500.3107 was amended by 1991 PA 191. Because replacement services were included in *work loss benefits* before the amendatory act was adopted, the reference to *allowable expenses* was clearly nugatory at that time, and there is no indication that the Legislature intended to rectify this problem when it amended MCL 500.3107 in 1991. See part IV(C) of this opinion. In short, just as the reference to "allowable expenses" in MCL 500.3135 was essentially an empty vessel before the 1991 amendment, it remained an empty vessel after the amendment. That is, the majority's interpretation *here* is not what renders the reference to "allowable expenses" in MCL 500.3135(3)(c) nugatory.[15] Even more pertinently, however, the dissent's proposal to remedy this admittedly nugatory reference would render nugatory the overall organization of MCL 500.3107(1), a problematic result that does not seem to concern the dissent. Thus, there are alternative understandings of this highly imperfect statute that render nugatory either the reference to "allowable expenses" in MCL 500.3135(3)(c) or the overall organization of the statute. The majority seeks to address

---

[15] The dissent contends that the reference to "allowable expenses" was not nugatory before the 1991 amendment. See *post* at 7. However, it fails to explain how that could have been the case given that, as previously explained, replacement services were included in work loss benefits at that time. What else apart from "replacement services" could possibly have been included in "allowable expenses" at the time?

18

and resolve this tension, while the dissent avoids it. Accordingly, although our interpretation maintains the nugatory reference to "allowable expenses," a reference that has been in place since before the 1991 amendment of MCL 500.3107, the dissent's proposed interpretation renders the Legislature's larger structure nugatory.

Moreover, the dissent is internally inconsistent in this regard. On one hand, the dissent asserts that the reference to "allowable expenses" in MCL 500.3135(3)(c) is rendered nugatory unless that reference includes replacement services. Thus, it concludes that "allowable expenses" must include replacement services. On the other hand, the dissent asserts that the 1991 amendment did not affect the categorization of PIP benefits in MCL 500.3107(1). Thus, it concludes that "work loss" must include replacement services. However, replacement services cannot be included in MCL 500.3135(3)(c) simultaneously as both allowable expenses *and* work loss benefits. The dissent cannot have it both ways; the 1991 amendment either changed the PIP categories or it did not.

Perhaps, or perhaps not, recognizing this inconsistency, the dissent then proceeds to argue that "the more logical interpretation of [MCL 500.3135(3)(c)] is that" "allowable" modifies "expenses," "work loss," and "survivor's loss." *Post* at 7. That is, the "allowable expenses" defined in MCL 500.3107(1)(a) are different from the "allowable expenses" referred to in MCL 500.3135(3)(c). Never mind that it would be entirely superfluous for MCL 500.3135(3)(c) to refer to "allowable work loss" or "allowable survivor's loss" "as defined in [MCL 500.3107 to 500.3110]" unless those sections somehow provided for the recovery of *nonallowable* benefits, which they certainly do not. As we explained in response to the Court of Appeals' similar argument,

19

see note 14 of this opinion, it is simply unreasonable to believe that although the no-fault act clearly defines the term "allowable expenses" in MCL 500.3107(1)(a), "allowable expenses" should be given a *different* definition in other provisions of the same act. Additionally, replacement services were included in work loss benefits before 1992, and this same argument would have applied then. Yet replacement services clearly fell within MCL 500.3135(3)(c)'s reference to "work loss" at that time. Thus, if the term "expenses" in the description of replacement services did not render replacement services "allowable expenses" pursuant to MCL 500.3135(3)(c) before 1992, it should not do so now.

None of these difficulties in giving reasonable and coherent meaning to MCL 500.3135(3)(c) is acknowledged or addressed by the dissent, or causes it to demonstrate insight into either the imperfections of the statute or its own construction of that statute. Instead, it is much easier to isolate only those parts of the statute that lend support for the results the dissent evidently prefers and to characterize as "absurd" any other result. But although the dissent is selective in the parts of the statute to which it gives attention, avoiding language that is most troublesome from its perspective, the dissent nonetheless reveals much by its invocation of the 'absurd results' doctrine. One can be quite sure that the dissent would have felt no need to invoke such an extraordinary doctrine in reaching its conclusions had the actual language of the statute been in any way sufficient to reach the same conclusion.

Nevertheless, the dissent concludes that our interpretation is "not consistent with the legislative intent," *post* at 3, but, rather, constitutes "a systematic dismantling of significant sections of the no-fault act [that] produces absurd results," *post* at 4. The

20

dissent premises its conclusions on its idiosyncratic formulation of an "absurd results" doctrine.[16] The rationale for the dissent's assertion that our analysis produces "absurd results" is entirely grounded in the fact that our interpretation excludes replacement services from not only the residual-tort-liability provision, MCL 500.3135(3)(c), which is at issue in this case, but also the accrual provision, MCL 500.3110(4); the subtraction-or-reimbursement provision, MCL 500.3116(4); and the exception to the one-year period of limitations in MCL 500.3145(1).

The justices in the majority have differences concerning whether the "absurd results" doctrine exists in Michigan.[17] See *Univ of Mich Regents v Titan Ins Co*, 487

---

[16] Although the dissent never actually articulates the standard by which it deems a result to be "absurd," it cites Justice MARILYN KELLY's dissent in *Cameron v Auto Club Ins Ass'n*, 476 Mich 55; 718 NW2d 784 (2006), for the general proposition that "statutes should be construed to avoid absurd results . . . ." *Post* at 3 n 6 (citation and quotation marks omitted). In *Cameron*, Justice KELLY argued that "a result is absurd where it is clearly inconsistent with the purposes and policies of the act in question." *Cameron*, 476 Mich at 128-129 (KELLY, J., dissenting). Still, to the extent that the dissent's standard can be determined at all, that standard seems to fall well short of even Justice KELLY's standard in *Cameron*, rejecting as "absurd" any results the dissent finds "illogical." See *post* at 1, 8, and 9.

[17] Although the dissent claims that it is "ironic" that we are so critical of its use of the "absurd-results" doctrine given that "members of the majority are in complete disagreement among themselves regarding the proper use or existence of the absurd-results doctrine," *post* at 8 n 13, there is not the least such "irony." First, the dissent invokes a doctrine that it altogether fails to define and indeed flies in the face of contrary definitions by individual dissenting justices. See note 16 of this opinion. Thus, whether the dissenting justices are in their own "complete disagreement among themselves" regarding the doctrine cannot be answered simply because it is impossible to discern what any one of them believes is required by the doctrine. Second, the majority squarely acknowledges that there are differences among us regarding the "absurd results" doctrine. However, regardless of its vitality, the doctrine has no relevance in the instant case. The dissent thus not only avoids any genuine scrutiny of the unmistakable tensions within the

21

Mich 289, 346 n 16; 791 NW2d 897 (2010) (MARKMAN, J., dissenting), overruled by *Joseph v Auto Club Ins Ass'n*, 491 Mich 200; 815 NW2d 412 (2012). For those justices who do not believe the doctrine has a place in our jurisprudence, see *People v McIntire*, 461 Mich 147, 152-160; 599 NW2d 102 (1999), whether the dissent is correct or not that the results here can be characterized as "absurd" is inapposite: the words mean what they say, replacement services are not listed in MCL 500.3135(3)(c) and, therefore, replacement services are not recoverable under that provision. For those who do adhere to the "absurd results" doctrine, the results here are simply not "absurd." "[A] result is only absurd if it is quite impossible that [the Legislature] could have intended the result . . . ." *Titan*, 487 Mich at 346 (MARKMAN, J., dissenting) (citation and quotation marks omitted), quoting *Cameron v Auto Club Ins Ass'n*, 476 Mich 55, 85 n 9; 718 NW2d 784 (2006) (MARKMAN, J., concurring). It is not "quite impossible" that the Legislature could have intended the result here.

To properly invoke the "absurd results" doctrine, the burden rests on the *dissent* to show that it is quite impossible that the Legislature could have intended to exclude replacement services from MCL 500.3110(4), MCL 500.3116(4), MCL 500.3135(3)(c), and MCL 500.3145(1). Rather than shoulder this burden-- which might require a serious-minded analysis of the Legislature's policy objectives in enacting the statutes, the political realities and disagreements within the Legislature that adopted the statutes, the necessity for compromise and negotiation leading to enactment of the statutes, and the

---

statute, but it leaves the bench and bar in the dark concerning the principles by which the dissent proposes to avoid this tension.

public impetus behind the statutes-- the dissent characterizes our interpretation as "absurd" because the dissent

> can see no logical basis to conclude that the Legislature intended this chaotic and arbitrary approach to the collection of no-fault benefits. . . . The far more reasonable interpretation recognizes that the Legislature intended MCL 500.3135(3)(c) to allow excess expenses for ordinary and necessary services to be recovered in a third-party tort action. [*Post* at 10.]

However, the "absurd results" doctrine "must not be invoked whenever a court is merely in disagreement, however strongly felt, with the policy judgments of the Legislature." *Cameron*, 476 Mich at 80 (MARKMAN, J., concurring). Still, the dissent fails to grapple with its obligations under the "absurd results" doctrine, preferring instead to summarily impose on the law its own characterization of the statute's unstated yet supposedly "obvious intent," *post* at 1, which "obvious intent" should be allowed to trump the actual words and statutory organization enacted by the Legislature. As in *Cameron*, although perhaps the law in question here could have been made more consistent or more complete in some ways, we cannot conclude that it is "quite impossible" that the Legislature could have intended its results. At the very least, it is the burden of plaintiffs, not this Court, to explain why the results reached in this case are "quite impossible." In the absence of this burden's being satisfied, those in the majority who subscribe to an "absurd results" rule prefer to err on the side of the language and organization of the statute rather than on the side of a supposedly "obvious intent" that is nowhere communicated within the vehicle within which "obvious intents" are usually communicated: the statute itself.

Although it is not our burden to suggest conceivable explanations that would render the instant statute "not absurd," one *possible* explanation for the exclusion of replacement services from MCL 500.3135(3)(c) and other provisions of the no-fault act concerning economic losses lies in the obvious fact that the four types of benefits identified in MCL 500.3107 and MCL 500.3108 are defined, operate, and apply differently. For example, work loss benefits are limited to the first three years after the date of an accident, MCL 500.3107(1)(b), while allowable expenses are not, MCL 500.3107(1)(a). Survivor's loss benefits have a ceiling for each 30-day period, MCL 500.3108(1), while replacement services do not, MCL 500.3107(1)(c). Put simply, these benefits are not fungible or indistinguishable in every particular *except* for the treatment of replacement services. Rather, it is entirely possible that the Legislature might have chosen to include or exclude replacement services from some categories of no-fault benefits, but not from others, depending on the scope and contours of each of those benefits. Moreover, although the dissent cites "the chaotic consequences that will result from" our interpretation as the basis for its "absurd results" conclusion,[18] *post* at 8, the

---

[18] The dissent characterizes our interpretation as a "sudden departure from the historical rule." *Post* at 8. The rule to which the dissent refers is the Court of Appeals' conclusion in *Swantek v Auto Club of Mich Ins Group*, 118 Mich App 807, 809; 325 NW2d 588 (1982), that the "right of action against the tortfeasor for excess economic loss exists in . . . replacement services." Even if we set aside the facts that this Court is not bound by decisions of the Court of Appeals and that the statement constitutes dictum from a case considering whether travel expenses to obtain medical treatment were recoverable as PIP benefits, *Swantek* was decided a decade before MCL 500.3107 was materially amended, at which time replacement services were removed from the work loss provision. Thus, at the time *Swantek* was decided, replacement services may have been recoverable under MCL 500.3135 *as work loss.*

only *actual* absurdity it contends will arise is that replacement services will be treated differently than all other no-fault benefits, see *post* at 8-10. That is true. Yet "treating things differently" or "treating things alike," as the case may be, of course, lies at the core of legislative decision-making and, absent legislative categorizations that implicate the Constitution, such categorizations are generally no business of this Court, even if some of its justices may believe that more "reasonable" categories could have been chosen.

Although it may be that the "better" public policy would be to include replacement services in these other provisions of the no-fault act, this Court is not empowered to act as the people's lawmaker-in-chief. Rather, it must be assumed that the language and organization of the statute better embody the "obvious intent" of the Legislature than does some broad characterization surmised or divined by judges. As previously explained, there are a number of reasons why the Legislature might conceivably have intended to exclude replacement services from MCL 500.3135(3)(c). It is not for this Court to "enhance" or to "improve upon" the work of lawmakers where we believe this

---

The dissent also cites *Kreiner v Fischer*, 471 Mich 109, 114 n 2; 683 NW2d 611 (2004), overruled by *McCormick v Carrier*, 487 Mich 180 (2010), and the model civil jury instruction on economic and noneconomic losses in an action for third-party benefits involving comparative negligence, M Civ JI 36.15, in support of its analysis. While *Kreiner* did mention that damages for replacement services are recoverable in tort, the issue in *Kreiner* was whether the plaintiffs had satisfied the "serious impairment of body function" threshold set forth in MCL 500.3135(1), not whether damages for replacement services were recoverable in tort under MCL 500.3135(3)(c). Therefore, that statement was dictum. As for the model civil jury instruction, it is axiomatic that those instructions are not binding law. They are offered merely to assist trial courts. See *People v Petrella*, 424 Mich 221, 277; 380 NW2d 11 (1985). The dissent is incorrect that by today's decision we depart from some "historical rule," *post* at 8, or cast aside a "well-established interpretation of MCL 500.3135(3)(c)," *post* at 1.

can be done, for it will always be easier for 7 judges on this Court to reach agreement on the merits of a law than 110 state representatives and 38 state senators representing highly diverse and disparate constituencies. Therefore, this Court must, as our interpretation does, rest its analysis on the language and organization of the statute.

## VI. CONCLUSION

In a third-party tort action, damages for excess allowable expenses, work loss, and survivor's loss are recoverable pursuant to MCL 500.3135(3)(c). Because replacement services are not among the categories listed in MCL 500.3135(3)(c), damages for replacement services are not recoverable in such an action. Accordingly, we reverse the Court of Appeals' judgment in part, reinstate the trial court's grant of summary disposition in defendant's favor on plaintiff's economic damages claim for replacement services expenses, and remand the case to the trial court for further proceedings not inconsistent with this opinion.

Stephen J. Markman
Robert P. Young, Jr.
Mary Beth Kelly
Brian K. Zahra

26

STATE OF MICHIGAN

SUPREME COURT

PENNY JO JOHNSON,

      Plaintiff-Appellee,

v                                                No. 143088

JOHN RECCA,

      Defendant-Appellant.

_____

HATHAWAY, J. (*dissenting*).

This Court granted leave to examine whether MCL 500.3135(3)(c) permits recovery of expenses in excess of the limitations contained in MCL 500.3107 to MCL 500.3110 for "ordinary and necessary services"[1] under the no-fault act in a third-party tort action. Despite the fact that nothing in the no-fault act governing "ordinary and necessary services" has changed since 1991, the majority casts aside the well-established interpretation of MCL 500.3135(3)(c) and now holds that excess expenses for "ordinary and necessary services" are no longer recoverable. The majority's decision is especially troubling because it ignores the obvious intent of the Legislature and, in doing so, creates conflicting and illogical rules regarding the collection of no-fault benefits. Because I see no compelling reason to impose this quagmire on the no-fault system, I respectfully dissent.

---

[1] "Ordinary and necessary services" are commonly referred to as "replacement services."

The general rule in third-party tort actions is that only noneconomic expenses are recoverable. However, certain statutory exceptions to this general rule exist. The issue before us is whether excess expenses for "ordinary and necessary services," payable under MCL 500.3107(1)(c), qualify as a designated exception. MCL 500.3135(3)(c) governs this issue. It provides:

> (3) Notwithstanding any other provision of law, tort liability arising from the ownership, maintenance, or use within this state of a motor vehicle with respect to which the security required by [MCL 500.3101] was in effect is abolished except as to:

>    * * *

> (c) *Damages for allowable expenses, work loss, and survivor's loss as defined in* [MCL 500.3107 to 500.3110] *in excess of the daily, monthly, and 3-year limitations contained in those sections.* The party liable for damages is entitled to an exemption reducing his or her liability by the amount of taxes that would have been payable on account of income the injured person would have received if he or she had not been injured. [Emphasis added.]

Under this subdivision, "[d]amages for allowable expenses, work loss, and survivor's loss as defined in [MCL 500.3107 to 500.3110] in excess of the daily, monthly, and 3-year limitations contained in those sections"[2] may be recovered in a third-party action. The majority holds that because expenses payable for ordinary and necessary services under MCL 500.3107(1)(c)[3] is a separate category of expenses that is

---

[2] MCL 500.3135(3)(c).

[3] MCL 500.3107(1)(c) provides:

> Expenses not exceeding $20.00 per day, reasonably incurred in obtaining ordinary and necessary services in lieu of those that, if he or she had not been injured, an injured person would have performed during the

2

not specifically referred to in MCL 500.3135(3)(c), excess expenses for those services are no longer recoverable in a third-party tort action. I disagree. When the language of these provisions is read in concert with the no-fault act as a whole, it is clear that the majority misconstrues the language of the subdivisions involved and interprets them in a manner that is not consistent with the legislative intent.

The most important task in interpreting a statute is to determine the legislative intent,[4] and "consideration of the whole act should govern in its interpretation."[5] Thus, at the outset, it is our duty to determine if the Legislature intended to include "ordinary and necessary services" expenses within the purview of MCL 500.3135(3)(c). Moreover, in order to give due respect to the Legislature, statutes "'must be construed to prevent absurd results . . . .'"[6] When the no-fault act is read as a whole,[7] it is clear that the

---

> first 3 years after the date of the accident, not for income but for the benefit of himself or herself or of his or her dependent.

[4] *Potter v McLeary*, 484 Mich 397, 410-411; 774 NW2d 1 (2009), citing *Sun Valley Foods Co v Ward*, 460 Mich 230, 236; 596 NW2d 119 (1999).

[5] *Harrow v Metro Life Ins Co*, 285 Mich 349, 356; 280 NW 785 (1938).

[6] *People v Tennyson*, 487 Mich 730, 741; 790 NW2d 354 (2010), quoting *Rafferty v Markovitz*, 461 Mich 265, 270; 602 NW2d 367 (1999); see, also, *Cameron v Auto Club Ins Ass'n*, 476 Mich 55, 110; 718 NW2d 784 (2006) (KELLY, J., dissenting) ("The principle that statutes should be construed to avoid absurd results that are manifestly inconsistent with legislative intent is not a new or radical innovation.").

[7] In interpreting a statute, this Court avoids a construction that would render any part of the statute surplusage or nugatory. *People v McGraw*, 484 Mich 120, 126; 771 NW2d 655 (2009), citing *Baker v Gen Motors Corp*, 409 Mich 639, 665; 297 NW2d 387 (1980). The statute must be read as a whole. See *Sun Valley*, 460 Mich at 237. Individual words and phrases, while important, should be read in the context of the entire legislative scheme. *Herman v Berrien Co*, 481 Mich 352, 366; 750 NW2d 570 (2008).

3

Legislature intended to allow recovery of excess "ordinary and necessary services" expenses in tort actions. To interpret MCL 500.3135(3)(c) as the majority does requires a systematic dismantling of significant sections of the no-fault act and produces absurd results.

It is undisputed that, before the enactment of 1991 PA 191, expenses for excess ordinary and necessary services were recoverable in a third-party tort action. Before the statute was amended, "ordinary and necessary services" were part of "work loss" damages as defined in MCL 500.3107(b), as added by 1972 PA 294. *Swantek v Automobile Club of Michigan Insurance Group*,[8] interpreted that version of MCL 500.3107(b) and found that the Legislature clearly intended that excess expenses for ordinary and necessary services be recoverable in a third-party tort action. The Court explained:

> Under the no-fault act, an insured may collect from his insurer for limited economic loss, *i.e.*,work loss, [ordinary and necessary] services, and medical and funeral expenses without regard to fault. MCL 500.3105(2), 500.3107. An insured may also sue the negligent tortfeasor for excess economic loss. MCL 500.3135(2)(c). It is clear that the Legislature has divided an injured person's economic loss into two categories: loss for which the no-fault insurer is liable and loss for which the tortfeasor is liable.
>
> *The right of action against the tortfeasor for excess economic loss exists in all categories in which the insurer's liability is limited by the statute: work loss, funeral cost, and* [*ordinary and necessary*] *services.*[9]

---

[8] *Swantek v Auto Club of Mich Ins Group*, 118 Mich App 807; 325 NW2d 588 (1982).

[9] *Id*. at 809 (emphasis added; citations omitted).

4

In 1991 PA 191, the Legislature separated expenses for "ordinary and necessary services" from "work loss," moving them from former MCL 500.3107(b) into a newly numbered subsection, MCL 500.3107(1)(c). Notably, the Legislature did not amend any other corresponding provisions within the no-fault act to reflect that it intended to create a new hybrid category of benefits with different rules applicable to the recovery of those expenses. In other words, there is no language in 1991 PA 191 that implies or suggests that the Legislature intended that ordinary and necessary services be treated differently before and after the amendment.[10] While the majority finds that the absence of such language in the no-fault act creates an "obvious tension," resulting in a "difficult interpretive task," I disagree.[11] The 1991 amendment was not complex, nor does it require a difficult interpretive task. One need only consider the purpose of the amendment and interpret the provision in a manner that is consistent with the no-fault act as a whole to come to the inescapable conclusion that the majority simply misconstrues this statutory provision and in doing so disregards legislative intent.

The amendment of MCL 500.3107 by 1991 PA 191 was only intended to make changes with regard to work-loss benefits for persons over the age of 60. The amendatory act added MCL 500.3107(2), which allowed persons 60 years of age or older to waive coverage for work-loss benefits by signing a waiver on a form provided by the insurer. Nothing in the legislative history indicates that any change was intended with

---

[10] The no-fault community, including insurers and insureds, has accepted *Swantek*'s interpretation as controlling law notwithstanding the enactment of 1991 PA 191.

[11] *Ante* at 17.

5

respect to the recovery of excess expenses in third-party tort actions. The house legislative analysis explained:

> The bill would amend Chapter 31 of the Insurance Code, which deals with no-fault automobile insurance, to allow people 60 years of age and older to waive coverage for work loss benefits if they would not be eligible to receive them in the event of an accidental bodily injury (in an auto accident). . . . The waiver of coverage would only apply to benefits payable to the person or persons who had signed the waiver form.
>
> Currently, work loss benefits cover 1) the loss of income from work . . . and 2) expenses up to $20 per day incurred in obtaining ordinary and necessary services in lieu of those the injured person would have performed for himself or herself, or for a dependent, during the three years following injury. . . . The waiver of work loss benefits permitted under the bill would only apply to loss of income from work. [House Legislative Analysis, HB 4041, January 14, 1992, p 1.]

Thus, nothing in the language of the statute itself or in the legislative history supports the assertion that the Legislature intended to change the way that ordinary and necessary services were treated merely because benefits for expenses for those services were separated from benefits for lost work income. The only change intended was providing a mechanism for individuals over the age of 60 to reduce their premiums by waiving work-loss benefits.

I also find the majority's analysis of the text of MCL 500.3135(3)(c) lacking because it fails to consider all the language in the provision. The majority insists that the phrase "allowable expenses" in MCL 500.3135(3)(c) can only be read as having the same precise meaning as the phrase "allowable expenses" has in MCL 500.3107(1)(a). However, the full language of MCL 500.3135(3)(c) allows recovery in third-party tort actions of "[d]amages for allowable expenses, work loss, and survivor's loss as defined in [MCL 500.3107 to 500.3110] *in excess of the daily, monthly, and 3-year limitations*

6

*contained in those sections.*" (Emphasis added.) The majority's reading of the text ignores the balance of that sentence, which specifically provides that only those expenses that are *in excess of the prescribed limitations* are recoverable. The prescribed limitations are "daily, monthly, and 3-year limitations." The majority's analysis seemingly ignores the fact that there are no daily, monthly, or three-year limitations imposed on "allowable expenses" as enumerated in MCL 500.3107(1)(a). Under the majority's interpretation, the phrase "allowable expenses" within MCL 500.3135(3)(c) would be rendered meaningless because there are no allowable expenses, as enumerated in MCL 500.3107(1)(a), in excess of the "daily, monthly or 3-year limitations." Such damages simply do not exist.

Thus, the more logical interpretation of the text of MCL 500.3135(3)(c) is that it permits recovery of any excess expense, as long as the expense is "allowed" under the no-fault act and is subject to a daily, monthly, or three-year limitation. This interpretation is not new or novel; rather, it has been used by insureds and insurers since the adoption of the no-fault act. It is obvious that this interpretation is consistent with the scheme and organization of the no-fault act. Moreover, I cannot agree with the majority that the phrase "allowable expenses" as used in MCL 500.3135(3)(c) has been an "empty vessel" since it was enacted.[12] The majority simply fails to acknowledge that the phrase had meaning until today, and it is only under the majority's new interpretation of this subdivision that the phrase becomes meaningless.

---

[12] *Ante* at 18.

7

Further, the majority's interpretation transforms expenses for ordinary and necessary services into some type of phantom category of benefits, subject to no discernible rules. This illogical and absurd outcome is best illustrated by understanding the chaotic consequences that will result from the majority's sudden departure from the historical rule.[13] For example, if expenses for excess ordinary and necessary services are no longer recoverable in tort actions simply because they are not specifically referred to in MCL 500.3135(3)(c), then it is also necessary to conclude that claims for "ordinary and necessary services" do not accrue when they are incurred as set forth in MCL 500.3110(4) because that provision also does not specifically refer to "ordinary and necessary services."[14] Thus, insureds and insurers are left with no guidance at all regarding when these benefits accrue.

Similarly, this newly crafted interpretation of MCL 500.3135(3)(c) significantly affects the mandates of MCL 500.3145(1), which provides:

> An action for recovery of personal protection insurance benefits payable under this chapter for accidental bodily injury may not be commenced later than 1 year after the date of the accident causing the injury unless written notice of injury as provided herein has been given to the insurer within 1 year after the accident or unless the insurer has previously made a payment of personal protection insurance benefits for the

---

[13] Given that members of the majority are in complete disagreement among themselves regarding the proper use or existence of the absurd-results doctrine, I find it ironic that the majority is so highly critical of my use of the concept.

[14] MCL 500.3110(4) provides:

> Personal protection insurance benefits payable for accidental bodily injury accrue not when the injury occurs but as the *allowable expense, work loss or survivors' loss* is incurred. [Emphasis added.]

8

injury. If the notice has been given or a payment has been made, the action may be commenced at any time within 1 year after the most recent *allowable expense, work loss or survivor's loss* has been incurred. However, the claimant may not recover benefits for any portion of the loss incurred more than 1 year before the date on which the action was commenced. The notice of injury required by this subsection may be given to the insurer or any of its authorized agents by a person claiming to be entitled to benefits therefor, or by someone in his behalf. The notice shall give the name and address of the claimant and indicate in ordinary language the name of the person injured and the time, place and nature of his injury. [Emphasis added.]

Under the majority's analysis of MCL 500.3135(3)(c), expenses for ordinary and necessary services are no longer subject to the second sentence of MCL 500.3145(1) because those expenses are not specifically referred to. In practical terms, does this mean that the time for filing a lawsuit to recover expenses for ordinary and necessary services is now governed only by the first sentence of MCL 500.3145(1), and that a lawsuit must be brought within one year from the date of an accident without regard to whether the benefits are overdue or the services have even been performed? Additionally, MCL 500.3107(1)(c) provides for the payment of PIP benefits for expenses incurred in obtaining ordinary and necessary services for the first three years after the date of the accident. Is the majority suggesting that the final two years of services cannot be recovered in a lawsuit, or is the majority suggesting that an injured party wishing to preserve his or her rights must bring a lawsuit even before services are rendered? It is hard to imagine a more chaotic, illogical, and absurd system for insureds and insurers to navigate.[15]

---

[15] Under the majority's interpretation, MCL 500.3116(4) (the subtraction-or-reimbursement provision for no-fault insurers) is also implicated. Thus, under the majority's interpretation, no-fault insurers can no longer seek recoupment of expenses for

I can see no logical basis to conclude that the Legislature intended this chaotic and arbitrary approach to the collection of no-fault benefits. It is our duty to interpret statutes in accordance with legislative intent, using sound logic and reasoning. The far more reasonable interpretation recognizes that the Legislature intended MCL 500.3135(3)(c) to allow excess expenses for ordinary and necessary services to be recovered in a third-party tort action.

Moreover, it is also important to recognize that the notion of expenses for ordinary and necessary services being recoverable in third-party tort actions is so well established and universally accepted that it has been incorporated into our Model Civil Jury Instructions. M Civ JI 36.15 explicitly recognizes the previously undisputed rule that excess expenses for ordinary and necessary services are recoverable in third-party tort actions. While jury instructions are not binding statements of the law, the recognition of this principle within the Model Civil Jury Instructions speaks loudly to the general acceptance of, and reliance by all parties on, this interpretation.

Finally, two members of today's majority found this same position persuasive in the past. In *Kreiner v Fischer*,[16] Justices YOUNG and MARKMAN agreed that under MCL 500.3135(3)(c), "[a]n injured person may file a tort claim against the party at fault seeking to recover *excess* economic losses (wage losses and [ordinary and necessary services] expenses beyond the daily, monthly, and yearly maximum amounts)." Given

---

ordinary and necessary services in accordance with MCL 500.3116(4) because it also does not use the specific phrase "ordinary and necessary services."

[16] *Kreiner v Fischer*, 471 Mich 109, 114 n 2; 683 NW2d 611 (2004), overruled by *McCormick v Carrier*, 487 Mich 180 (2010).

the unequivocal nature of the position taken by Justices YOUNG and MARKMAN on this issue, I find it difficult to accept that they now casually disregard that position simply because it was said in dictum.

While the majority claims it has no choice but to interpret the act in this fashion, I disagree. It is the duty of this Court to interpret statutes in accordance with the intent of the Legislature and in a manner that does not produce absurd results. Accordingly, I respectfully dissent.

Diane M. Hathaway<br>
Marilyn Kelly

CAVANAGH, J. I concur in the result proposed by Justice HATHWAY's dissenting opinion.

Michael F. Cavanagh